IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **MARTHA POLINSKY,** *et al.* | : | Case No.:  10-CV-02544 |
| Plaintiffs, | : | Judge Benita Pearson |
| v. | : | |
| **COMMUNITY HEALTH PARTNERS** | : | |
| **REGIONAL HEALTH SYSTEMS,** *et al.* | | |
| | : | |
| Defendants. | | |

---

**MEMORANDUM IN SUPPORT**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

---

John T. Murray (0008793)
jotm@murrayandmurray.com
Direct Dial: (419) 624-3125
Leslie O. Murray (0081496)
Leslie@murrayandmurray.com
Direct Dial: (419) 624-3010
Michael J. Stewart (0082257)
Stewart@murrayandmurray.com
Direct Dial: (419) 626-7008
**MURRAY & MURRAY CO., L.P.A.**
111 East Shoreline Drive
Sandusky, Ohio  44870
Telephone:      (419) 624-3000
Facsimile:      (419) 624-0707


Kevin J. Zeiher
**DOLYK & ZEIHER**
165 East Water Street
Sandusky, Ohio 44870
Telephone:      (419) 625-0515
Facsimile:      (419) 625-0170
kjzeiher@dzlpa.com
*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

Table of Contents.................................................................................................................i-ii

Table of Authorities..........................................................................................................iii-vii

I.  INTRODUCTION ..................................................................................................1

II.  PROCEDURAL HISTORY.....................................................................................2

III.  FACTUAL BACKGROUND...................................................................................4

    A.  Several months after being injured in a car accident, Martha Polinsky receives two MRI
       scans at Community Health Partners .................................................................4

    B.  After finally submitting the bill for Martha's first MRI to Anthem, Community Health
       Partners initiated collection activity directly against Mr. and Mrs. Polinsky.....................6

    C.  Community Health Partners' automated billing process runs its course ...........................8

    D.  Neither AllianceOne nor the Burke Law Firm employ any policy or procedure to avoid
       collection harassment against insured patients ..................................................8

IV.  LAW AND ARGUMENT .........................................................................................9

    A. General Principles for Class Certification .........................................................9

    B. The Express and Implicit Requirements of Fed.R.Civ.P. 23(a) are satisfied ...................13

        1.  Rule 23(a)(1) – Numerosity ..............................................................15

        2.  Rule 23(a)(2) –Common Questions of Law or Fact ........................................20

        3.  Rule 23(a)(3) – Typicality .................................................................23

        4.  Adequacy of Represeantion – Fed.R.Civ.P. 23(a)(4) .....................................24

           a.  The Class Representative is Adequate.................................................24

           b.  Class Counsel is Competent and Qualified..........................................25

C.   The Classes are Maintainable Under Fed.R.Civ.P. 23(b)(3) ............................................26

      1.  A Class Action Is Superior to Other Available Methods of Resolving this Controversy ..................................................................................................26

      2.  Common Questions of Law and Fact Predominate Over Individual Issue ......27

V.   CONCLUSION ................................................................................................................30

## TABLE OF AUTHORITIES

**CASES**

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231 (1997) ...................................24

*Blackie v. Barrack*, 524 F.2d 891, 901, n. 17 (C.A.9 1975), cert. denied, 429 U.S. 816, 97 S.Ct.
57 (1976) ...............................................................................................................................10

*Bogosian v. Gulf Oil Corp.* (C.A.3, 1977)*, 561 F.2d 534 .............................................................29

*D'Alauro v. Raymark Indus., Inc.*, 782 F.R.D. 451(E.D.N.Y. 1996) ...........................................20

*Daffin v. Ford Motor Co.*, 458 F.3d 549 (C.A. 6, 2006) .............................................................11

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)..............................................................10, 11

*Erika P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. – , 180 L. Ed. 2d 24, 2011 U.S. LEXIS
4181 (2011) ..........................................................................................................................11

*Esplin v. Hirschi*, 402 F.2d 94, 99 (C.A.10, 1968), cert. denied, 394 U.S. 928, 89 S.Ct. 1194
(1969) ...................................................................................................................................11

*Evans v. American Credit Systems, Inc.*, 222 F.R.D. 388, 395 (D.Neb. 2004) ...........................20

*Faralli v. Hair Today, Gone Tomorrow*, 2007 U.S. Dist. LEXIS 1977 .......................................13

*General Telephone Co. v. Falcon*, 457 U.S. 147, 156 (1982) ......................................................20

*Golden v. City of Columbus*, 404 F.3d 950 (6th Cir. 2005)..........................................................15

*Grace v. Detroit*, 145 F.R.D. 413  (E.D. Mich. 1992)..................................................................10

*Green v. Wolf Corp.*, 406 F.2d 291 (C.A.2, 1968) ........................................................11

*Hamilton v. Ohio Sav. Bank*, 82 Ohio St.3d 67, 1998-Ohio-365, 694 N.E.2d 442 ......................14

*Haroco v. American National Bank*, 121 F.R.D. 664 (N.D.Ill. 1988) ..........................................21

*Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266, 92 S.Ct. 885 (1972) .........................................10

*In re American Medical Systems, Inc.*, 75 F.3d 1069 (6th Cir. 1996) ...........................................23

*In re Risk Management Alternatives, Inc., Fair Debt Collection Practices Act Litigation*, 208 F.R.D. 493 (S.D.N.Y. 2002) .......................................................................................16

*In re Scrap Metal Antitrust Litigation* (C.A.6, 2008), 527 F.3d 517 ...........................................29

*In re Sumitomo Copper Litigation*, 182 F.R.D. 85 (S.D.N.Y.1998) ..............................................11

*In re Whirlpool Corp. Front-Loading Washer Products Litigation*, 2010 U.S. Dist. LEXIS 69254, (N.D. Ohio 2010) ................................................................................................11

*Iron Workers Local Union No. 17 Insurance Fund v. Philip Morris, Inc.*, 182 F.R.D. 523, 533 (N.D.Ohio 1998) .........................................................................................................23

*Mayo v. Sears, Roebuck & Co.*, 148 F.R.D. 576 (S.D. Ohio 1993) ...............................................10

*Midland Funding, LLC v. Brent*, 2010 U.S. Dist. LEXIS 117501 (N.D. Ohio 2010) .................14

*Miller v. University of Cincinnati*, 241 F.R.D. 285 (S.D.Ohio 2006) ...........................................20

*Miller v. Volkswagen of America, Inc.*, 6th Dist. No. E-07-047, 2008-Ohio-4736 ......................25

*Pettrey v. Enterprise Title Agency, Inc.*, 241 F.R.D. 268, 279 (N.D.Ohio 2006) .........................16

*Pevets v. Crain Communications, Inc.*, 2011-Ohio-2700 ..............................................................25

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 7978 (1985) ...............................................................27

*Promedica Health System and the Toledo Hospital v. Virginia King*, Ohio S.Ct. Case No. 2010-1236......................................................................................................................................................17

*Schemmer v. ChartOne, Inc.*, 2007 WL 1822274 (N.D. Ohio 2007) ...........................................25

*Senter v. General Motors Corp.*, 532 F.2d 511, 523 n. 24 (6th Cir. 1976)....................................15

*Shelter Realty Corp. v. Allied Maintenance Corp.*, 574 F.2d 656 (C.A.2 1978)...........................10

*Stanich v. Travelers Indemnity Company*, 249 F.R.D. 506 (N.D.Ohio 2008)..............................16

*Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988)..................................................28

*Walther v. Pension Plan for Salaried Employees of the Dayton-Walther Corp.*, 880 F.Supp. 1170, (S.D. Ohio 1994)................................................................................................................10

*Watkins v. Simmons & Clark, Inc.*, 618 F.2d 398 (6th Cir. 1980)................................................27

*Wilkerson v. Bowman*, 200 F.R.D. 605 (N.D.Ill. 2001)................................................................16

**RULES**

Fed.R.Civ.P. 23(a) .......................................................................................................9, 13, 26

Fed.R.Civ.P. 23(a)(1)..............................................................................................................15

Fed.R.Civ.P. 23(a)(2)..............................................................................................................20

Fed.R.Civ.P. 23(b) ............................................................................................................9, 26

Fed.R.Civ.P. 23(b)(3)..................................................................................................26

Fed.R.Civ.P. 23(d)(2)..................................................................................................11

R.C. § 1751.60 .................................................................................................1,17, 28

R.C. § 1751.60(A).......................................................................................................22

R.C. § 3923.81 ............................................................................................................28

R.C. § 3923.81(A)....................................................................................................1, 22

Rule 23 ............................................................................................10, 11, 15, 26, 27

**OTHER AUTHORITIES**

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE § 1778 (2d ed. 1986) ...................................................................14, 27

## I.    INTRODUCTION

This case is involves a large hospital network's practice of ignoring the discounted negotiated reimbursement rate available to its patients who are covered by health insurance in an effort to collect more from patients through direct collection activity.  Community Health Partners' practice of billing insured's for the full retail rate of covered services directly violates two sections of the Ohio revised code.  Pursuant to R.C. § 1751.60(A), providers accepting policies issued by "health insuring corporations" must seek compensation "solely" from that source and "not under any circumstances" from the patient directly.  Further, pursuant to R.C. § 3923.81(A), when an insured patient is required to pay out-of-pocket for health care, the amount "shall not exceed the amount the person is required to pay to a health care provider or pharmacy shall not exceed the amount the sickness and accident insurer, health insuring corporation, or multiple employer welfare arrangement would pay under applicable reimbursement rates negotiated with the provider."

Discovery has shown that Community Health Partners has a practice of failing to record in the relevant account and ignoring available health insurance and coding the account as self-pay when it has reason to believe that a patient has another available payment source.  After health insurance information is collected and then is ignored at admission, the patient's account proceeds automatically through an escalating series of debt collection steps, culminating in a collection lawsuit.  (See Exhibit 1 & 2, Community Health Notes of Carpenter deposition at Exhibits 1, 2a and 2; See also Exhibit 3, AllianceOne notes which is attached to Carpenter deposition as Exhibit 12).

Further, discovery has shown that the two debt collector-defendants routinely pursue collection action based on nothing more than Community Health Partners' representations that

1

the alleged medical debt is due from the patient.  (Michael Burke deposition, generally and Rothenbuhler deposition, generally).  In this case, both debt collectors essentially admit that they were aware that Plaintiffs had health insurance, but proceeded with collection anyway.  Because neither AllianceOne nor the Scheer, Green and Burke Defendants maintain <u>any</u> procedures to avoid collection activity against patients with health insurance, Plaintiffs allege that they committed unfair and deceptive collection practices as defined by the Fair Debt Collection Practices Act ("FDCPA") and Ohio Consumer Sales Practices Act ("OCSPA").  Further, because neither AllianceOne nor Scheer, Green and Burke Defendants maintain any procedures to avoid collection activity of amounts greater than the negotiated reimbursement rates on patients with health insurance covering the medical services provided, Plaintiffs allege that they committed unfair and deceptive collection practices in violation of the FDCPA and OCSPA.

This dispute should be resolved on a class-wide basis by addressing the key issues which are presented in the common questions of law: 1) whether, in light of the two statutory provisions cited above, Community Health Partners is entitled to ignore health insurance policies in favor of directly collecting from the patient; and 2) whether AllianceOne and the Scheer, Green and Burke Defendants are entitled to simply rely on the hospital's representations about the validity of the medical debt in all circumstance without any procedures of due diligence to ensure that it is not a violation of law to pursue the debt from the consumer.

All of these issues can and should be resolved on a class-wide basis.

## II.    PROCEDURAL HISTORY

Although this case has been pending for slightly less than one year, discovery regarding class certification issues has been formally open for four months.  As a practical matter, the Defendants have only been providing witnesses for depositions sought by Plaintiffs for

approximately six weeks, or since the last status conference on June 10, 2011.  Plaintiffs issued their first set of written discovery on January 3, 2011.  Plaintiffs have yet to receive fulsome responses from Community Health Partners and AllianceOne.  Plaintiffs sought the cooperation of scheduling depositions with Defendants almost immediately after the March 29, 2011 Case Management Conference which opened up the ability to conduct discovery.  Plaintiffs spent an inordinate amount of time over the months of April and May attempting to schedule the depositions of Defendants.  Dozens of emails were exchanged.  The Defendants have continued their practice of delay and refused to even identify individuals who had direct contact at registration and pre-registration with the Plaintiffs.  On July 27, 2011, the parties jointly requested an approximately 60-day extension of the discovery and briefing schedule.  (ECF # 103).  To date, the Court has not ruled on this agreed motion, and, in compliance with the existing Case Management Conference Order, ECF # 54, Plaintiffs now file their motion for class certification.

Plaintiffs respectfully request leave to supplement this motion after Plaintiffs receive responses to the written discovery served months prior and are able to take the depositions of individuals relevant to Plaintiffs claims and class certification.  By way of context, Plaintiffs review the procedural history.  Plaintiffs filed their original state-court complaint on October 1, 2010.  Due the removal to Federal District Court, the reassignment among District Judges and two successive requests to stay this action by Community Health Partner (ECF # 13, 55), discovery in this case was slow to get underway.  Despite the urging of Plaintiffs in dozens of communications throughout April and May, the Defendants did not respond to written discovery within thirty days after the Case Management Conference and did not cooperate in scheduling depositions until the end of May.  Then on the eve of the last status conference, the Scheer,

Green and Burke Defendants' moved the court (ECF # 85 )in attempt  to shift the course of discovery as delineated in the court's Case Management Conference Order (EDC # 54).  In any event, discovery did not commence in earnest until this Court summarily denied this request on June 10.

It is worth noting that all parties agree that discovery relevant to a decision on class certification is not yet complete.

## III.    FACTUAL BACKGROUND

Plaintiff Martha Polinsky was injured in a car accident on February 12, 2007. (Martha[1] depo. 16:12-16:14).    Martha endured serious injuries, which required extensive medical treatment over a relatively long period of time.  Per the recommendation and prescription of her doctors, Martha received two MRI scans at Community Health Partners, one on December 29, 2007 and a second on April 14, 2008, (Carpenter depo. 38:3-38:11).  The billing and collection practices associated with the second scan, in April 2008, form the basis for this action.

### A.  Several months after being injured in a car accident, Martha Polinsky receives two MRI scans at Community Health Partners.

Community Health Partners relies on the billing department of the larger Mercy Health System.  The automated system at the heart of Mercy billing system is known as SMS Pathways, manufactured by Invision.  (Carpenter depo. 28:18-28:20).  The system is divided between the so-call "front-end," or registration, functions and "back end," or billing functions.  (Carpenter depo. 28:20-29:7).  The two parts of the Pathway system are apparently set up such that they have only limited interaction between them.

---

[1] For the purposes of clarity and ease of reading, Plaintiffs Robert and Martha Polinsky will be referenced by first name.

According to Mercy's Regional Director of Patient Financial Services, Debra Carpenter, a patient is requested to provide information about potential payors as part of the admissions process.  (Carpenter depo. 27:6-27:21).  The clerk completing the admission process apparently enters information into the SMS Pathways system.  Despite the fact that registration and admission procedures were among the topics listed on Plaintiffs' Fed.R.Civ.P. 30(b)(6) notice, Ms. Carpenter was not able to testify about the subject.  (ECF # 74, topics 2,4 and 5; Carpenter depo. 27:22-28:6)    Broad classes of payors, known as "high-level groupings," are coded as letters in the Pathways system, such as Blue Cross, commercial insurers, Workers Comp and Medicare.  (Carpenter depo. 30:16-31:7).  For example, "B" indicated Blue Cross policies such as Anthem. (Carpenter depo. 39:21-39:22).  "C" represents commercial policies.  (Carpenter depo. 34:20-34:22).  "D" represents a determination that an automobile insurer is responsible for payment.  (31:16-31:20).

When information about health insurance is entered at registration, a standard form UB-04 is created for the purpose of invoicing the insurer.  (Carpenter depo. 29:11-29:15).  In the event that the patient is identified as self-pay ("S") at the time of admission, no UB-04 is created. (Carpenter depo. 29:21-30:1).

When a patient is identified as self-pay, or responsible for his or her own medical expenses, the collection procedure is essentially automated.  After a three-day "cooling off period," Community Health Partners prints an invoice and sends it to the patient.  (Carpenter depo. 62:15-63:2).  As a matter of practice, Community Health never invoices a patient for anything less than the retail "charges" for its services.  (Carpenter depo. 65:20-66:5).  The hospital never discloses to the patient a "preferred provider" rate that it accepts from an insurer

such as Anthem. *Id.* Although the hospital may make further attempts to collect the bill on its own, it largely relies on third-party debt collectors.

Community accounts are sent to debt collectors based on age. (Carpenter depo. 94:9-94:17). After the account has been in "self-pay" status for 61 days, it is sent to an "early out" collector. (Carpenter depo. 94:15-94:17). Generally, after 120 days at the "early out" collector, the debt is escalated to a "bad debt" collector, in this case, AllianceOne. (Carpenter depo. 95:2-98:8; 96:4-96:10). Once AllianceOne receives the account, it is responsible for billing any insurance. (Carpenter depo. 96:15-96:17).

The decision to "go legal", or actually file a lawsuit against a patient, is generally made by AllianceOne after other collection efforts have proved unsuccessful. (Carpenter depo. 100:22-101:3). Apparently, this decision largely turns on whether AllianceOne believes that the debt is collectable, or whether the patient has a job or sufficient assets to make a lawsuit worthwhile. (Carpenter depo. 101:1-101:2; Rothenbuhler depo. 110:6-110:12).

**B. After finally submitting the bill for Martha's first MRI to Anthem, Community Health Partners initiated collection activity directly against Mr. and Mrs. Polinsky.**

With respect to Mr. and Mrs. Polinsky, the dispute in this case centers on bills for two MRI scans performed on Martha in December 2007 and April 2008.

The first MRI was performed on December 29, 2007. Community Health Partners apparently began collecting billing information from Mr. and Mrs. Polinsky before the appointment. Although Martha's first MRI was initially entered into Community Health Partner's system as a self-pay, by December 24 Community Health Partners had properly recorded her Anthem policy as the responsible payor. (Carpenter depo. 45:3-45:17). For reasons that are currently unclear and likely subject to dispute, Community Health Partners then removed the Anthem policy as the primary payor and determined that either Mr. and Mrs. Polinsky or

their personal injury attorney, Kevin Zeiher, would be the primary payor.[2]  (Carpenter depo. 45:19-47:21).  Community Health Partners went so far as to create a special "payor" designation for Mr. Zeiher.  (Carpenter depo. 50:19-50:21).  That is, Community Health Partners briefly began treating Mr. Zeiher as Martha's primary insurance company.  *Id.*  Eventually, Community Health Partners again reversed itself and billed Anthem for Martha's first MRI on March 14, 2008.  (Carpenter depo. 50:21-50:23).  On May 27, the hospital accepted Anthem's payment of $640 in full satisfaction of its $3991.43 charge.  (Carpenter depo. 51:6-51:17).  Ultimately, the bill for Martha's December 29 MRI was settled by Anthem for $3351.43 less than Community Health Partners initially charged.  *Id.*

Despite the hospital's initial attempt to designate either Mr. and Mrs. Polinsky themselves or their attorney as the "responsible payor" for the first MRI, it had no trouble obtaining reimbursement from Martha's Anthem plan after it properly submitted the bill. Moreover, there can be no question that Community Health Partners was entirely aware of Martha's Anthem policy no later than March 14, 2008 when it submitted an invoice to that plan.

When Martha was preparing to register for a second MRI in April, the hospital nonetheless steered billing away from the Anthem plan and towards Martha herself.  Although Ms. Carpenter acknowledged that Community Health Partners was aware of the Anthem policy from Martha's December MRI (Carpenter depo. 58:3-59:3), the hospital registered her as "MVA self pay" on April 11, 2008.  (Carpenter depo. 59:11-60:9).  Although Ms. Carpenter was unable or unwilling to explain why this occurred at her deposition, it is clear that the direction came from Community Health Partners' "Pathways" billing system.  *Id.*  As set forth above, the information available from the hospital's billing system at the time clearly indicated that Anthem

---

[2] Again, Ms. Carpenter was unable to shed any light on why this occurred.

7

was the responsible payor for the first MRI and there is no indication of why, or at whose direction, Martha's second MRI was classified as "MVA self pay."

### C. **Community Health Partners' automated billing process runs its course.**

After Community Health Partners ignored Martha's health insurance policy and registered them as self-pay for Martha's second MRI, the hospital's automated collection process ran its course.  After a stint at an "early out" collection agency, Martha's account was referred to AllianceOne, the hospital's "bad debt" collector, on September 30, 2008.  (Carpenter depo. 70:5-70:13).  After a period of collection efforts by AllianceOne, the debt collector asked Community Health Partners for permission to "go legal" and sue Mr. and Mrs. Polinksy in July 2009.  (Carpenter depo. 108:20-109:4).  Although the hospital reserved the right to revisit the issue if Mr. and Mrs. Polinsky disputed the matter with the courts, the hospital authorized AllianceOne to proceed.  (Carpenter depo. 109:7-110:14).  AllianceOne then referred the account to the Burke law firm, which filed a complaint in the Norwalk Municipal Court in the fall of 2009.  As set forth below, neither AllianceOne nor the Burke law firm took any steps to determine whether they were collecting against a patient with health insurance or that the amount which they were collecting was authorized by Ohio law.

### D. **Neither AllianceOne nor the Burke Law Firm employ any policy or procedure to avoid collection harassment against insured patients.**

In addition to their claims against Community Health Partners, Plaintiffs also bring federal FDCPA and Ohio CSPA claims against the two debt collectors that harassed and ultimately sued them for the full, retail, inflated rates charged by Community Health Partners.  Representatives from both debt collectors freely testified that, despite being in the business of collecting medical debt, they maintain absolutely no procedures to avoid collection activity against patients with health insurance or to comply with state law for this type of collection

8

activity.  This is true despite the fact that Ohio law specifically prohibits the type of balance billing and search for alternative payment options that occurred here.

AllianceOne's corporate representative designated pursuant to Fed.R.Civ.P 30(b)(6), Kathy Rothenbuhler, testified that the debt collector relies solely on Community Health Partners' representations regarding the amount and legitimacy of a medical debt.  (Rothenbuhler depo. 39:9-39:14).  AllianceOne does absolutely no due diligence of its own to determine whether the debt is due and owing.  (Rothenbuhler depo. 39:12-39:14).  Sometimes, AllianceOne starts collection activity with little more than a name, address and phone number of the alleged debtor. (Rothenbuhler depo. 36:10-36:16).

Similarly, the Burke Law Firm relies solely on the representations made to it by AllianceOne and Community Health Partners before filing suit.  At his deposition, firm principal Michael Burke repeatedly testified that his firm relies solely on the fact that AllianceOne and Community Health Partners "certify" to him that the debt is valid.  (M. Burke depo. 13:4-13:11; 18:9-18:14; 21:4-21:10; 37:18-37:22; 49:15-49:18).  When asked to describe what, in anything, the hospital had done to insure that the debt certified to him was due and owing, Michael Burke responded that he did not know.  (M. Burke depo. 50:5-50:16).  Instead, the Burke Law Firm simply relied upon the certification.

## IV.    LAW AND ARGUMENT

### A.  General Principles for Class Certification

For more than seventy years of class action litigation, the *threshold* requirements have remained constant: numerosity, commonality, typicality, and adequacy of representation.  The case law is replete with examples of classes that define these Fed.R.Civ.P. 23(a) requirements. Likewise, the Fed.R.Civ.P. 23(b) requirements are well defined as: (1) limited fund or class-wide

9

conduct, (2) injunctive relief with or without damages or (3) a damages class with predominance and superiority.

"The Federal Rules of Civil Procedure mandate a two-step process to determine if an action is maintainable as a class action." *Walther v. Pension Plan for Salaried Employees of the Dayton-Walther Corp.*, 880 F.Supp. 1170, 1176 (S.D. Ohio 1994); *Mayo v. Sears, Roebuck & Co.*, 148 F.R.D. 576, 579 (S.D. Ohio 1993). "*First*, the court must determine whether the four prerequisites to a class action are present, [that is, numerosity, commonality, typicality and adequacy of representation]. *** *Second*, if the foregoing prerequisites are satisfied, the court must then decide whether one of the factual situations described in Rule 23(b) has been met." Id. (emphasis of *Mayo*); Fed.R.Civ.P. 23. "In determining whether to certify a class, a court is prohibited from considering the merits of the action." *Walther*, 880 F.Supp. 1170, 1177; *Mayo*, 148 F.R.D. 576, 579; *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140 (1974). "For purposes of a class certification motion, a court must accept as true the factual allegations contained in the complaint." *Walther*, 880 F.Supp. 1170, 1177; *Mayo*, 148 F.R.D. 576, 579; *Shelter Realty Corp. v. Allied Maintenance Corp.*, 574 F.2d 656, 661, n. 15 (C.A.2 1978); *Blackie v. Barrack*, 524 F.2d 891, 901, n. 17 (C.A.9 1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57 (1976).

Rule 23 "provides for class actions that may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266, 92 S.Ct. 885 (1972). This advantage in prosecuting a claim as a class action rather than an individual action, further allows for the inclusion of many claimants who would otherwise be "unable to have their rights vindicated." *Grace v. Detroit*, 145 F.R.D. 413, 416-417 (E.D. Mich. 1992).

After a class has been certified, the trial court retains authority to alter or amend any orders addressing how the action is to be conducted.  Fed.R.Civ.P. 23(d)(2).  "If there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." *Green v. Wolf Corp.*, 406 F.2d 291, 298 (C.A.2, 1968), quoting *Esplin v. Hirschi*, 402 F.2d 94, 99 (C.A.10, 1968), cert. denied, 394 U.S. 928, 89 S.Ct. 1194 (1969); *In re Sumitomo Copper Litigation*, 182 F.R.D. 85, 88 (S.D.N.Y.1998).

As this Court has noted, "whether a particular plaintiff has suffered harm is a merits issue not relevant to class certification."  *In re Whirlpool Corp. Front-Loading Washer Products Litigation*, 2010 U.S. Dist. LEXIS 69254, *5 (N.D. Ohio 2010); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974); *Daffin v. Ford Motor Co.*, 458 F.3d 549, 553 (C.A. 6, 2006). Accord, *Erika P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. – , 180 L. Ed. 2d 24, *33, 2011 U.S. LEXIS 4181 (2011) (holding that plaintiffs need not prove causation in order to obtain class certification).

The Plaintiffs maintain they have demonstrated compliance with Rule 23 and have established facts sufficient to meet the threshold for numerosity, common questions of law and fact, adequacy, typicality, identifiability of an unambiguous class and predominance and superiority.  However, to the extent the Court seeks additional substantiating evidence, either documentary or testimonial, the Plaintiffs seek leave to supplement this motion when the Defendants have complied with their obligations under the Federal Rules of Civil Procedure to produce documents requested by the Plaintiffs on January 3, 2011 and May 3, 2011.  As of the date of this filing, Community Health Partners has unilaterally withheld documents promised to the Plaintiffs both in writing in the form of the responses to the requests for production (Exhibit

11

4), on the telephone in numerous phone calls and in person at three separate depositions. Community Health Partners has not raised an objection to the requests nor have they disputed the existence of the documents.  Community Health Partners has simply withheld the relevant documents from the Plaintiffs.  At each meet and confer when the Plaintiffs approached Community Health Partners in an attempt to resolve the dispute and obtain the documents, Community Health Partners promised to provide the documents in the immediate future. Plaintiffs assumed CHP was operating in good faith and would live up to their promise to produce the requested documents.  Plaintiffs further sought deposition testimony of six individuals who had direct contact with the Polinskys, the Polinsky account or could provide testimony to the subjects of examination noticed in the Rule 30(b)6 notice served on May 24, 2011.  At the date of this filing, Community Health Partners has not provided the name of the individuals who conducted the intake, nor have they produced an individual who could testify on behalf of the corporation for all of the subjects of examination included in the May 24, 2011 notice of deposition of the corporation of Community Health Partners.

Similarly, AllianceOne has withheld documents which were requested on May 3, 2011 in the Plaintiffs Requests for Production.  AllianceOne's corporate representative has testified that they have recording of the telephone conversations with the Polinskys.  (Rothenbuhler dep. 65:18-66:2).  These recordings were sought in the initial document requests.  There was indication in the responses that there was additional documentation that would be made available for review.  When Plaintiffs' counsel sought to schedule a time to review said documents, counsel for AllianceOne indicated both in person and then in a follow-up letter that there were NO such documents and that the indication on the responses were merely a standard response. At the corporate deposition of AllianceOne, it became clear that there were recordings and a

number of policies and procedures specifically requested and not provided to Plaintiffs that exist. Plaintiffs immediately follow up with a request for these documents and specifically identified these documents referenced in the deposition.  Plaintiffs were again met with promises that the documents would be provided in the immediate future.  AllianceOne has not provided any of the documentation as promised.

Plaintiffs relied in good faith on the representations of the Defendants with respect to their promises to provide the documents requested.  CHP has even withheld the names of the intake individuals who had direct contact with the Polinskys and are identified by their initials in the intake notes.  Two weeks prior to the Class Certification Briefing Deadline, the parties conferred and agreed to seek the assistance of the Court in extending the deadlines for briefing the class certification issue.  All parties agreed on a proposed amended schedule.  At this time, the Court has not ruled on the motion to extend the deadlines.  Thus, the Plaintiffs file their memorandum in support of their motion for class certification and are confident in the law, analysis and evidence included in this memorandum in support of their motion.  However, if the Court finds the motion lacking in any fashion, the Plaintiffs request leave to supplement this brief after the Defendants have fulfilled their obligations to respond to discovery requests.

## B.  The Express and Implicit Requirements of Fed.R.Civ.P. 23(a) are satisfied.

In addition to the specifically delineated requirements of Fed.R.Civ.P. 23(a), there are two requirements implicit to all class actions.  These requirements - that (1) the class must be identifiable and unambiguously defined, and (2) the class representatives must be members of the class - are clearly met in the case at bar.  *Warner*, 36 Ohio St.3d at 96.  Accord, *Faralli v. Hair Today, Gone Tomorrow*, 2007 U.S. Dist. LEXIS 1977, *13.

Regarding the first implicit requirement, "identifiable and unambiguous" class, the Ohio Supreme Court explained: "The requirement that there be a class will not be deemed satisfied unless the description of it is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Warner*, 36 Ohio St.3d at 96, citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure (2 Ed. 1986) 120-121, Section 1760. "Thus, the class definition must be precise enough to permit identification within a reasonable effort." *Warner*, 36 Ohio St.3d at 96. "The focus at this stage is on how the class is defined," not whether there are "differing factual and legal issues." *Hamilton v. Ohio Savings Bank*, 82 Ohio St.3d 67, 73, 1998-Ohio-365, 649 N.E.2d 442. At this stage, the Supreme Court concluded, "the class, where possible, should be defined upon the *basis of the manner in which the defendant acted toward* an ascertainable group of persons." *Id*.

Class Members can be identified through reasonable efforts. It is not necessary for this Court to delve into any subjective issues in order to identify the Class Members. If the Defendants here are like all defendants in virtually all other class actions, they will plead that "mini-trials" will be needed and that therefore this Court will be on a treadmill to nowhere. Courts have universally dispatched such arguments where, as here, all that is required is a simple review of the business files to determine who is a Class Member. See, e.g., *Midland Funding, LLC v. Brent*, 2010 U.S. Dist. LEXIS 117501 (N.D. Ohio 2010), at *9 ("*** the Court is convinced that certification of Class 1 would not require mini-trials or individual inquiries that would create unreasonable costs. Again, it appears that determining membership in Class 1 would require little more than reviewing the court file in a debt collection action to see if a Form 400, or a substantially similar affidavit, was filed during the relevant time period.")

14

A simple review of Community Health Partners' records showing that a patient who has proof of insurance of file and then is subjected to collection activity for more than co-pays or deductibles and for more than the reimbursement rate will identify numbers of Classes A, B, and C. This is readily obtainable by reviewing the financial class letter codes in the Community Health Partners computer system. Patients with insurance are coded with an insurance code. Any patient whose record at Community Health Partners shows an insurance code and is then subject to collection activity is a member of the Classes A, B, and C.

### 1. Rule 23(a)(1) – Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). There is no strict numerical test for determining when too many parties make joinder impracticable, and the court should look to the specific facts of each case. *Senter v. General Motors Corp.*, 532 F.2d 511, 523 n. 24 (6th Cir. 1976). The practicality of joinder depends on the size of the class, the ease of identifying members, the ability to make service, and their geographic dispersion. However, "impracticable" does not mean "impossible." A class representative need only show that joining all members of the potential class is extremely difficult or inconvenient. Numbers alone are not determinative of this question. *Golden v. City of Columbus*, 404 F.3d 950, 965 (6th Cir. 2005).

A plaintiff must "present more than speculation, but plaintiffs do not have to establish class size with precision." *Lichoff v. CSX Transp., Inc.*, 218 F.R.D. 564, 570 (N.D.Ohio 2003). "[T]he court may assume sufficient numerousness where reasonable to do so in absence of a contrary showing by defendant, since discovery is not essential in most cases in order to reach a class determination . . . Where the exact size of the class in unknown, but it is general knowledge

or common sense that it is large, the court will take judicial notice of this fact and will assume joinder is impracticable."  Newberg on Class Actions § 7.22.A.

For example, it is reasonable to infer that the number of class members exceeds the minimum necessary from the standardized use of form documents or the existence of uniform procedures that affect the class.  *In re Risk Management Alternatives, Inc., Fair Debt Collection Practices Act Litigation*, 208 F.R.D. 493, 504 (S.D.N.Y. 2002) (common sense dictates that joinder would be impracticable when over a million letters were mailed during the class period); *Wilkerson v. Bowman*, 200 F.R.D. 605, 609 (N.D.Ill. 2001) (numerosity met when defendants sent hundreds of standard form collection letters each year); *Pettrey v. Enterprise Title Agency, Inc.*, 241 F.R.D. 268, 279 (N.D.Ohio 2006) ( for a RESPA claim, where settlement documents in mortgage loan files indicate a charge for or payment allocated to an affiliated business entity, and one such entity conducts approximately 50 transactions a month, "the Court is confident that the number of class members would reach into the hundreds and that numerosity is satisfied); and *Stanich v. Travelers Indemnity Company*, 249 F.R.D. 506, 522 (N.D.Ohio 2008) (finding numerosity were the class consisted of the purchasers of homeowners insurance policies at a price higher than what was available for an identical policy from the same company, that "likely includes hundred, if not thousands, of individuals").

Catholic Healthcare Partners is the parent company of Community Health Partners. Catholic Healthcare Partners is the largest health system in Ohio and one of the largest nonprofit health systems in the U.S.  Exhibit 5,

http://www.mercyonline.org/news_show.aspx?id=2749&mode=local.  Mercy Health Systems is also a member of Catholic Healthcare Partners and is the part of the organization tasked with the billing for a large portion of the organization including the billing for Community Health

Partners. (Carpenter depo. 18:22-20:4). Mercy applied identical billing and collection practices for all of the hospitals for which it conducts billing and collection.  *Id.*  Community Health Partners, Mercy Health Partners and Catholic Healthcare Partners all espouse in their own publications the enormous size of Mercy's systems.  They further emphasize the uniformity of their systems in their Merit Brief in the *Promedica v. King* case currently pending in the Ohio Supreme Court and the uniform impact on their practices across the state of an interpretation of ORC 1751.60. Merit Brief of Amici Curae Mercy Health Partners and Catholic Healthcare Partners In Support of Appellants, *Promedica Health System and the Toledo Hospital v. Virginia King*, Ohio S.Ct. Case No. 2010-1236.  (Exhibit 6).

"Mercy Health Partners, as an entity, employs over five thousand (5,000) individuals and has over fifteen hundred (1,500) physicians on staff at its various facilities.  In addition, Mercy Health Partners and, in fact, all medical providers throughout the State of Ohio, ***have well-established, long-standing, and functional registration and billing practices and procedures for medical services provided to individuals, all of which would require amendment and revision, at a significant expenditure of time, energies and resources***…." (emphasis added) Merit Brief of Amici Curae Mercy Health Partners and Catholic Healthcare Partners In Support of Appellants, *Promedica Health System and the Toledo Hospital v. Virginia King*, Ohio S.Ct. Case No. 2010-1236, p.25.

Mercy goes on to describe in detail the enormity of their organization within the state of Ohio in its representations to the Ohio Supreme Court in the *Promedica v. King* Amici Brief. "Similarly, Catholic Healthcare Partners, the parent company of Mercy Health Partners, …is the largest health system in the State of Ohio and one of the largest non-profit health systems in the United States. As the fourth largest employer in the State of Ohio and a company that operates

over one hundred (100) healthcare organizations meeting the healthcare needs of the people of Ohio, Kentucky, Tennessee and Pennsylvania, Catholic Healthcare Partners clearly has a significant interest in the issues raised by ProMedica and the Toledo Hospital within the appeal taken in the *Virginia King* case, as the determination of those issues will undoubtedly impact all of the healthcare organizations and facilities operated by Catholic Healthcare Partners throughout the entire State of Ohio."

Moreover, Community Health Partners, Mercy Health Partners and Catholic Healthcare Partners publish the voluminous impact on the number of individuals who participate in the systems of Catholic Healthcare Partners in a press release published on Mercy Health Partner's Website.  "Community Health Partners is a full-service, not-for-profit, integrated healthcare system, which provides inpatient, outpatient and ancillary services to Lorain County and surrounding communities through its two hospitals, Community Regional Medical Center in Lorain and Allen Community Hospital in Oberlin; physician offices; and specialized facilities, including the Community Cancer Center, Great Lakes Rehabilitation Center, Northern Ohio Imaging Center and New Life Hospice. Community Health Partners is a member of Catholic Healthcare Partners, the largest health system in Ohio and one of the largest nonprofit health systems in the U.S. For more information on Community Health Partners, please visit **www.community-health-partners.com**." Exhibit 5.

In this case, common sense dictates that the number of individuals subject to the billing practices of CHP who had health insurance but were subjected to collection activity must be in the hundreds if not thousands.  Catholic Healthcare Partners is the largest healthcare system in the state of Ohio.  It is only logical to conclude that the number of individuals effected by the billing practices of a large hospital within the organization that touts itself as the largest medical

18

provider in the state of Ohio will be a number of individuals greater than is practical to join in one lawsuit.  Certification of the classes requested in this motion would answer the question of whether the pertinent Ohio statutes protect individuals from being billed directly by medical providers for services that are covered by health insurance or whether medical providers are free despite the statutory language to seek payment through collection activity directly from the patient for the full retail rate.  This question applies equally to all individuals who received treatment for a medical service that was covered by health insurance and were then subjected to collection activity on that account.  CHP does not dispute that this occurred.  Neither do they dispute that this occurrence is part of their regular practice of operation.  To the contrary, CHP like the other defendants all maintain that the billing and collection activity of the Polinskys for the MRI that was covered by an Anthem policy was allowable and done in accordance with their policies.  The action is appropriate for class treatment because the question is whether this policy is a violation of Ohio law and that question is identical for hundreds if not thousands of the affected members of the putative class.  The putative classes of persons with claims against CHP meet the numerosity requirement.

AllianceOne uses the Burke Law firm for all legal collection action out of the Maumee Office.  (Rothenbuhler depo. 105.)  Community Health Partners only uses AllianceOne for collection of bad debt.  (Debra Carpenter depo. 70.)  Furthermore, AllianceOne and the Burke Firm maintain that the Polinsky situation was in accordance with it policies.  There is no assertion that this is a rogue event outside of their business practices.  In fact, when AllianceOne was asked in its Rule 30(b)(6) corporate deposition: "are you satisfied with what the Burke Law Firm did in the reference to the Polinsky account?"  AllianceOne responded: "Yes. They followed the information that we sent them."  (Rothenbuhler depo. 108.)

Considering the number of individuals being treated through Community Health Partners as a part of the largest health care provider in Ohio and one of the largest in the country, it is only logical to conclude that the sole debt collector and the sole law firm used to pursue those accounts would constitute a number greater than an handful and therefore more than would be practical to join into a single lawsuit.   The putative classes of persons with claims against AllianceOne and the Burke Law firm meet the numerosity requirement.

### 2.  Rule 23(a)(2) –Common Questions of Law or Fact

Plaintiffs must also show "questions of law or fact common to the class."  Fed.R.Civ.P. 23(a)(2).  A class representative must "be part of the class and 'possess the same interest and suffer the same injury' as the class members."  *General Telephone Co. v. Falcon*, 457 U.S. 147, 156 (1982) (internal citations omitted).  In this regard there must be at least one question of law or fact common to the class.  *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998).  The common question of law or fact must be a "common issue the resolution of which will advance the litigation."  *Id*

These requirements are normally satisfied when there is an essential common factual link between all class members and the opposing party for which the law provides a remedy.  *Evans v. American Credit Systems, Inc.*, 222 F.R.D. 388, 395 (D.Neb. 2004), citing *D'Alauro v. Raymark Indus., Inc.*, 782 F.R.D. 451, 458 (E.D.N.Y. 1996).  "[W]hen the legality of the defendant's standardized conduct to the class is at issue, the commonality factor is normally met."  *Miller v. University of Cincinnati*, 241 F.R.D. 285, 289 (S.D.Ohio 2006) (citations omitted).  Cases dealing with the legality of standardized documents or conduct are generally appropriate for resolution by means of a class action because the document or conduct is the

focal point of the analysis. *Haroco v. American National Bank*, 121 F.R.D. 664, 669 (N.D.Ill. 1988).

In this case there are many common questions of law and fact centered around the Defendants' conduct. Each of these questions point to the central focus: Is it a violation of an Ohioan's rights to pursue collection of payment on a medical account directly from the patient when the medical service was covered by medical insurance? In other words, are medical providers violating the law when they ignore the fact that a patient has medical insurance for a given service and pursues payment from that patient for the full retail rate of the service when the patient has contracted for a substantially lower reimbursement rate? The Polinskys maintain that Ohio law clearly and unequivocally prohibits the pursuit of payment and collection of the full retail rate from an individual who has contracted for health insurance and the collection account is for a service that is covered by that health insurance policy. At issue here, at this class certification stage, is whether a determination by the Court of the Polinskys' claims would be applicable to the rights of a class of people in a substantially similar way.

Mercy Health Partners itself has given us the answer to that question in their Amici Curae Brief in the *Promedica v. King* case: "Mercy Health Partners … [has] well-established, long-standing, and functional registration and billing practices and procedures for medical services provided to individuals, all of which would require amendment and revision, at a significant expenditure of time, energies and resources…." (emphasis added) Merit Brief of Amici Curae Mercy Health Partners and Catholic Healthcare Partners In Support of Appellants, *Promedica Health System and the Toledo Hospital v. Virginia King*, Ohio S.Ct. Case No. 2010-1236, p.25. Mercy Health Partners conducts all of the acute care billing for Community Health Partners at its Toledo location. (Carpenter depo. 19-20.) Mercy's contention that its systems of billing and

21

registration are "well-established" and "long standing".  The question is whether these policies and procedures result in violations of patients' rights.  The putative class has the same factual link: each member of the class has health insurance, provided proof of the health insurance to their medical provider (CHP) and CHP ignored the patient's right to payment of the reimbursement rate by the health insurance company and sought payment of the full retail rate from the patient and/or spouse through direct billing and third party collection activity.  The common questions of law and fact include, but are not limited to:

    a.   Was the class member insured at the time of treatment?

    b.   Did Community Health Partners submit the claim to the health insuring corporation?

    c.   Did Community Health Partners refuse to submit the claim to the health insuring corporation?

    d.   Did Community Health Partners attempt bill Plaintiffs and class members for out-of-pocket expenses in excess of what their health insurance would pay for the same services.

    e.   Are the billing and collection practices complained of herein unlawful pursuant to R.C. § 1751.60(A) and/or R.C. §3923.81(A).

    f.   Are the Scheer, Green and Burke defendants "debt collectors" as defined by the Fair Debt Collection Practices Act ("FDCPA")?

    g.   Is AllianceOne a "debt collector" as defined by the Fair Debt Collection Practices Act ("FDCPA")?

    h.   Did the Scheer, Green and Burke defendants violate the FDCPA by attempting to collect an invalid debt?

### 3.  Rule 23(a)(3) – Typicality

Under Rule 23(a)'s typicality requirement, a representative seeking class certification must show that his or her claims are typical of other potential class members' claims. Fed.R.Civ.P. 23(a)(3).   The Sixth Circuit has held that "[t]ypicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Sprague*, 133 F.3d at 399.  The court summarized this legal standard simply:  "as goes the claim of the named plaintiff, so go the claims of the class."  *Id.*

A representative's claim is typical if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."  *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (internal quotation marks omitted).  This requirement ensures that the court may properly attribute a collective nature to the challenged conduct.  *Id.*

A representative party's claims, however, need not be identical to those of the potential class members.  *Senter*, 532 F.2d at 524; *Iron Workers Local Union No. 17 Insurance Fund v. Philip Morris, Inc.*, 182 F.R.D. 523, 533 (N.D.Ohio 1998) ("the Court asks whether the representative plaintiffs, in pursuing their own claims will advance the claims and interests of the class.")

The Polinskys claims are substantially similar if not identical to the putative members of the Classes.  The Polinskys seek to represent a class of persons who, like themselves, suffered collection activity from their medical provider and its debt collectors after blatantly ignoring the fact that the patients had health insurance and provided proof of that health insurance to their medical provider.  The Polinskys are members of the proposed class and are typical of those

23

members.  As set fourth in affidavits filed with this motion, both Robert and Martha Polinsky understand their responsibility as class representatives and intend to vigorously prosecute this action.  See Martha Polinsky Depo, generally and Exhibits 7 and 8 (Affidaivts of Robert and Martha Polinsky).

### 4.  Adequacy of Representation – Fed.R.Civ.P. 23(a)(4)

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625.  "The Sixth Circuit has identified two criteria for determining whether the representation of the class will be adequate: (1) the representative must have common interests with unnamed members of the class, and (2) the representative will vigorously prosecute the interests of the class through competent counsel." *Walther*, 880 F.Supp. 1170, 1177; *Mayo*, 148 F.R.D. 576, 581; *Senter*, 532 F.2d 511, 525.  Accord, *Warner*, 36 Ohio St.3d at 98.  "Arguments challenging the adequacy of class representatives should be viewed skeptically." *Almendares*, 222 F.R.D. 324, 333.

### a.  The Class Representative is Adequate.

"A representative is deemed adequate so long as his or her interest is not antagonistic to that of other class members." *Warner*, 36 Ohio St.3d at 98.  The interest of the Plaintiffs is not antagonistic to the Class Members.  They have sought competent counsel to undertake this litigation to recover damages for the conduct of the Defendants.

The Polinskys are familiar with the basic facts that form the claims of the Class and there are no interests adverse or antagonistic to those of the Class.  In successfully prosecuting the claims alleged in the Complaint, the Polinskys will prove the claims held by the remaining Class Members.

Class Members who have health insurance and were subjected to collection practices on medical accounts for covered services by CHP, AllianceOne and/or the Burke Law Firm will be adequately represented.  Plaintiffs have answered discovery, provided documents, and appeared for conferences at the request of the Court.  The Polinskys seeks no relief not sought on behalf of the Class Members.  Accordingly, Plaintiffs are adequate representatives of the proposed Class.

### b.    Class Counsel is Competent and Qualified.

Counsel must be competent to handle litigation of the type involved in the case before class certification is allowed.  Id.  Plaintiff has retained law firms that are extremely familiar with complex civil and class litigation.  The law firm of Murray & Murray, Co., L.P.A., for example, has a time-honored reputation for competency, experience and skill in handling class actions, starting with the oft cited decision in *Warner* and reaffirmed as recently as the decision by Federal District Court Judge David Katz on November 4, 2010 in *Midland Funding, LLC v. Brent*, 2010 U.S. Dist. LEXIS 117501 (N.D. Ohio 2010); and by the Court of Appeals for the Sixth District of Ohio: on June 3, 2011 in *Pevets v. Crain Communications, Inc.*, 6th Dist. No. OT-10-023, 2011-Ohio-2700 and on September 19, 2008 in *Miller v. Volkswagen of America, Inc.*, 6th Dist. No. E-07-047, 2008-Ohio-4736; by Federal District Judge Ann Aldrich on June 22, 2007 in *Schemmer v. ChartOne, Inc.*, 2007 WL 1822274 (N.D. Ohio 2007); and on March 19, 2010 in *Wachovia Nat'l Bank of Del. N.A. v. Ball*, 6th Dist. No. H-08-022, 2010-Ohio-1479. Further examples of Murray & Murray Co., L.P.A.'s representation of clients in complex litigation is attached as Exhibit 9.

Plaintiffs' counsel has dedicated and will continue to dedicate high levels of legal skill in vigorously prosecuting this class action litigation to a conclusion on behalf of the Class. Plaintiff's counsel has had more that 45 years of class action litigation experience.

There is nothing to suggest that Mr. & Mrs. Polinsky do not intend to, or cannot, prosecute this case vigorously, or that class counsel is not competent to do so.  The "adequacy of representation" requirement of Fed.R.Civ.P. 23(a)(4) is satisfied.

### C.  The Classes are Maintainable Under Fed.R.Civ.P. 23(b)(3)

As the foregoing analysis demonstrated, the Fed.R.Civ.P. 23(a) requirements are satisfied.  Accordingly, class certification is proper if any of the alternative requirements of Fed.R.Civ.P. 23(b) is met.  Certification of the case is appropriate under Fed.R.Civ.P. 23(b)(3) because the common questions predominate over questions affecting only individual members and that a class action is superior to other available methods for the fair and efficien

### 1.  A Class Action Is Superior to Other Available Methods of Resolving this Controversy

The matters pertinent to a finding of superiority include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.  Fed.R.Civ.P. 23(b)(3).

Efficiency is the primary focus in determining whether the class action is the superior method for resolving the controversy presented.  Here, the putative class members would have little interest in individually controlling the litigation.  The claims presented here are the type of small claims that are generally best treated under the class action procedure.  The Advisory Committee Note accompanying the 1966 amendment to Rule 23 says that Rule 23(b)(3) was designed to facilitate claims similar to these class claims:  Rule 23(b)(3) "encompasses those cases in which a class action would achieve economies of time, effort, and expense."  Rule 23(b)(3) "was expected to be particularly helpful in enabling numerous persons who have small

26

claims that might not be worth litigation in individual actions to combine their resources and bring an action to vindicate their collective rights."  7AA Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE §1777.  Providing one action in which these individually small claims may be collected and addressed advances a fundamental purpose of the class action vehicle.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 7978, 809 (1985) ("class actions . . . may permit the plaintiff to pool claims which would be uneconomical to litigate individually."). Class actions are often the most suitable method for resolving suits to enforce compliance with consumer protection laws because the awards in an individual case are usually too small to encourage the lone consumer to file suit.  *Watkins v. Simmons & Clark, Inc.*, 618 F.2d 398, 404 (6th Cir. 1980).

In this case, no other method of adjudication is superior to a class action.  Plaintiffs challenge a widespread billing practice adopted by a large health care provider.  Individual actions brought by vigilant class members will likely be settled or resolved for the relatively modest amount of a particular medical bill.  Here, the $3300 difference between the amount billed by Community Health and the amount that it should of accepted from Anthem would probably not be pursued on an individual basis.  Meanwhile, the Defendants will continue to pursue their unlawful billing and collection practices against the vast majority of Ohioans that would not necessarily realize that they are being gouged.

### 2.  Common Questions of Law and Fact Predominate Over Individual Issue.

Rule 23(b)(3) focuses on the relationship between the common and individual issues. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis."  7A Charles Alan Wright, Arthur

R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE § 1778 (2d ed. 1986). The inquiry is designed to determine whether a class action is far more efficient to achieve the economies of time, effort and expense, thereby promoting judicial economy.  *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1196 (6th Cir. 1988).

There can be no question that common issues of law and fact predominate here. Essentially, the question of liability against both the hospital and its debt-collector co-defendants can be determined on a class-wide basis.   In contrast, individual issues will largely focus on damages.

With respect to Plaintiffs claims against the hospital, the core questions of statutory interpretation will be the same across all class members.  Community Health Partners essentially admits that it has no specific procedure for complying with R.C. §§ 1751.60 and 3923.81. (Carpenter depo. 117:15-120:14).  Instead, the hospital bills everyone like a Medicare patient. (Carpenter depo.  120:18-120:19). If a patient has been involved in an automobile accident and identifies an alternative payor, it will wait six months to submit a bill to the health insurer. (159:1-160:24). Community Health cites a Medicare regulation in support of this practice.  *Id.*

It is also undisputed that, here, the hospital was aware that Martha Polinsky had Anthem health insurance, however, whether though incompetence or intent, proceeded to invoice, collect form and sue Mr. and Mrs. Polinsky directly.  When the hospital does this, it <u>always</u> attempts to collect the full, retail charged amount.  (Carpenter depo. 65:20-66:2).  The reduced amount that would be paid by an insurer such as Anthem is <u>never</u> communicated to the patient. *Id.*

Community Health Partners' policy for directly billing patients is clear.   The core question at the heart of this litigation is whether this policy is lawful.  Plaintiffs maintain that the hospital's billing practices directly violate two sections of the Ohio Revised Code.  The hospital

apparently maintains that it is acting lawfully.  Resolution of this legal question can and should be achieved on a uniformed, class-wide basis.

Discovery to date has shown that Plaintiffs' claims against the debt-collector defendants are similarly centered around a single, essentially legal, issue.  Both debt collectors admit that they do not maintain any procedures for ensuring that they are not collecting against insured patients.  Instead, both AllianceOne and the Burke law firm rely exclusively on Community Health Partners' "certification" that the medical debt is due and owing.  Plaintiffs' maintain that this blind reliance is inadequate under the FDCPA and Ohio CSPA.  The debt-collector defendants maintain that they do enough.  The Court can resolve this question on a class-wide basis.

Individual issues will center around the impact of the Defendants' conduct on class members, essentially damages.  If Plaintiffs are correct, while some class members may have been billed (or in some cases paid) more than others, all were billed for more than they should have been.  Similarly, while some class members may have been subject to more or less vigorous collection activity, all were subject to collection on an allegedly inflated medical debt.  "[I]t has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate." *In re Scrap Metal Antitrust Litigation* (C.A.6, 2008)*, 527 F.3d 517, 536, quoting *Bogosian v. Gulf Oil Corp.* (C.A.3, 1977)*, 561 F.2d 534, 556.

Because individual issues are limited almost exclusively to damages, common issues of law and fact predominate here.

29

## V.    CONCLUSION

For all of the reasons set forth above, Plaintiffs respectfully request that the Court certify to above defined classes.  If the Court believes that more factual information is required about the billing and collection scheme at issue, Plaintiffs further request that the Court allow them to supplement the briefing herein after class certification discovery has been properly completed.

Respectfully submitted,

*/s/ John T. Murray*
John T. Murray (0008793)
jotm@murrayandmurray.com
Direct Dial: (419) 624-3125
Leslie O. Murray (0081496)
Leslie@murrayandmurray.com
Direct Dial: (419) 624-3010
Michael J. Stewart (0082257)
Stewart@murrayandmurray.com
Direct Dial: (419) 626-7008
**MURRAY & MURRAY CO., L.P.A.**
111 East Shoreline Drive
Sandusky, Ohio  44870
Telephone:     (419) 624-3000
Facsimile:      (419) 624-0707


Kevin J. Zeiher
**DOLYK & ZEIHER**
165 East Water Street
Sandusky, Ohio 44870
Telephone:     (419) 625-0515
Facsimile:      (419) 625-0170
kjzeiher@dzlpa.com
*Attorneys for Plaintiffs*

## CERTIFICATION

I hereby certify that on August 12, 2011, the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ John T. Murray*
John T. Murray (0008793)
Leslie O. Murray (0081496)
Michael J. Stewart (0082257)
**MURRAY & MURRAY CO., L.P.A**